**Harold P. DUPREE**

**v.**

**J. RAY McDERMOTT & CO., INC., et al.**

**Civ. A. No. 17825.**

United States District Court,
W. D. Louisiana,
Lake Charles Division.

Jan. 28, 1974.

J. B. Jones, Jr., Jones & Jones, Cameron, La., for plaintiff.

Richard D. Chappuis, Jr., Voorhies, Labbe, Fontenot, Leonard & McGlasson, Lafayette, La., Harry E. Barsh, Jr., Camp, Carmouche, Palmer, Carwile & Barsh, Allen L. Smith, Jr., Plauche, Smith & Hebert, Lake Charles, La., for defendants.

NAUMAN S. SCOTT, District Judge:

This is a diversity tort action arising out of an automobile-winch truck colli-

sion which occurred on October 24, 1971, at approximately 8:00 P.M. on Louisiana Highway 82, at a marine pipeline construction site in Cameron, Louisiana. The accident occurred when the automobile the plaintiff was driving struck a winch truck, owned by Chemical Services Inc. (CSI), while it was in the process of pulling out a bogged down cherry-picker. Suit was instituted against J. Ray McDermott & Co., Inc. (McDermott), the general contractor, and its insurer, Travelers Indemnity Company (Travelers), who in turn filed a third party demand against CSI and its insurers, American Casualty Company and Chicago Insurance Company, hereinafter collectively referred to as ACC, seeking contribution and/or a defense in indemnity.

After the trial of this matter on the merits, the jury first rendered a general verdict finding that defendant McDermott was guilty of actionable negligence, that defendant CSI was not a joint tort-feasor and therefore not subject to contribution as such, and awarded the plaintiff $750,000 in damages. The jury then returned a special verdict finding that Frank Gibbons and Larry Jones, McDermott's field engineer and flagman respectively, were negligent. The independent issue of whether McDermott is entitled to a defense and indemnification as "omnibus insureds" under the ACC and Chicago policies for the negligence of its employees concerning their alleged "use" of the CSI winch-truck was then taken under advisement and is the subject matter of this opinion.

All parties have conceded that the only applicable provisions of the ACC policy are the insuring provisions under the "comprehensive automobile liability insurance" section of the policy which provides in part as follows:

"The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of

"C. Bodily injury or

"D. Property damage

"To which this insurance applies, caused by an occurrence and arising out of the ownership, maintenance or use, including loading or unloading, of any automobile * * *."

The ACC policy further contains a standard "omnibus" clause, wherein "PERSONS INSURED" is defined to include, among others, the named insured (CSI) and the following parties:

"(c) any other person while using an owned automobile or a hired automobile with the permission of the named insured, provided his actual operation or (if he is not operating) his other actual use thereof is within the scope of such permission, but with respect to bodily injury or property damage arising out of the loading or unloading thereof, such other person shall be an insured only if he is:

(1) a lessee or borrower of the automobile, or

(2) an employee of the named insured or of such lessee or borrower;

(d) any other person or organization but only with respect to his or its liability because of acts or omissions of an insured under (a), (b) or (c) above."

It is undisputed that the winch-truck owned by CSI and operated by Charles A. Noland, CSI's employee, qualifies as an "automobile" and is a vehicle insured under the terms of the ACC policy. It is further undisputed that if either Larry Jones or Frank Gibbons would qualify as an insured under paragraph (c) then McDermott would also qualify as an insured under paragraph (d) with respect to that person since it is an organization which would have liability for the negligent acts of Jones or Gibbons under the doctrine of respondeat superior. Thus it is seen that the pivotal question is simply: Was Larry Jones or Frank Gibbons an insured under the terms and provisions of the ACC policy set forth above?

In order for Jones or Gibbons to qualify as an insured under the terms or provisions of the ACC policy, they must have been "using" the winch-truck with the permission of CSI, and within the scope of such permission. At the outset, the question of "loading and unloading" can be eliminated since the testimony of all witnesses was that the winch-truck was not to take on a load of any kind, but was only going to pull the cherry-picker out of the marsh by extending a winch line.

The term "use" has been defined by the courts in Louisiana as follows:

" * * * there is considerable authority that the term 'use' is a broad catch-all designed to include all proper uses of the vehicle not falling within the terms 'ownership' or 'maintenance'. Bolton v. North River Insurance Co., 102 So.2d 544 (La.App. 1st Cir. 1958); Tucker v. State Farm Mutual Automobile Ins. Co., 154 So.2d 226 (La.App. 2d Cir. 1963); Appleman's Insurance Law & Practice, Vol. 7, Sec. 4316(e); Annotation, 89 A.L.R.2d 150, at pages 163–172. The term *'use' involves simple employment for the purpose of the user* and is broader than the term 'operation' which involves direction and control of the mechanism such as by a driver. Maryland Casualty Co. v. Marshbank, 226 F.2d 637 (U.S.C.A.3rd 1955); Liberty Mutual Ins. Co. v. Steenberg Construction, 225 F.2d 294 (U.S.C.A. 8th 1955) * * *". Baudin v. Traders & General Ins. Co., 201 So.2d 379, 381 (La.App. 3rd Cir. 1957). (Emphasis supplied).

Although this court is well aware of the broad liberal interpretation which the courts in Louisiana have given to the term "use", the facts and circumstances of the instant case present an abnormal situation in which the normal policy factors favoring broad coverage are not present. No Louisiana cases covering this particular situation have been cited to us, nor does our own independent research reveal any.

In the instant case the only person actually operating the winch-truck was CSI's employee, Charles A. Noland whom the jury specifically found was not guilty of any negligence. Consequently, the question is whether Larry Jones or Frank Gibbons was "using" the truck in a sense broader than actual operation. More succinctly stated, the issue is whether Gibbons or Jones had a right of control over the winch-truck which would justify imposing legal responsibility upon them for its use.

Larry Jones testified that on the date of the accident, he was employed by McDermott and had been acting as the only flagman at the site of the pipeline crossing. Nowhere did Jones ever insinuate or contend that he had anything to do with the actual use of the truck for any purpose. In fact, he stated simply that he had volunteered to flag traffic passing by the scene, without having been assigned the task.

At approximately fifteen minutes prior to the time the accident occurred, Jones terminated his duties of flagging. He stated that when 8:00 o'clock came, his relief had arrived at the job but had not replaced him so he just quit and walked off the job. At the time the accident occurred, aproximately fifteen minutes after he had left his flagging station, Jones was not even sure of the exact position of the winch-truck, stating that he only knew that it was partially on the highway and partially off on the north shoulder. Jones testified that he left the scene to walk towards a carry-all owned by McDermott, turned and started back towards the winch-truck and had just turned to go back to the carry-all when the accident occurred.

By his own testimony, we find that Larry Jones had not "employed" the winch-truck for any "purpose of the user" under the test as set forth in *Baudin*. Furthermore, since Larry Jones had no physical connection with the truck, was not touching the truck, sitting in, riding on it, driving it, steering or operating it, nor was he involved in its supervision, direction, control or, for

that matter, in any way engaged in even attempting to assist in its operations at the moment the accident occurred, he clearly was not exercising such a right of control which would justify imposing legal responsibility upon him for the use of the winch-truck. It is obvious that the jury found that Jones was negligent simply because he walked off the job without awaiting the completion of the work for which he was flagging or securing a replacement or relief man to do the job.

In order to determine whether Frank Gibbons was "using" the winch-truck, we must determine at the outset what actions of his the jury found were negligent, for the ACC policy protects only against a negligent "use". By clear deductive reasoning it can be established that the jury did not find Gibbons negligent for the operation of the truck or its placement upon the highway per se. Since the jury found that Charles Noland was not negligent in his actual positioning of the winch-truck across the highway, then there cannot be imputed to Gibbons any negligence from the act itself. Therefore, the only possible negligence evolved from the lack of proper warning to passing motorists.

What actions of Gibbons the jury obviously did find negligent were his failure to assure that the flagman Larry Jones remained on the job, his failure to secure a replacement for Larry Jones and his failure to shut down the job at sundown as required by the permit obtained by McDermott from the Louisiana Department of Highways. All of these acts were clearly independent acts of negligence relating to his failure of general supervision.

Gibbons' testimony at the trial further supports this conclusion as it evidences the total absence of any subjective intent, purpose or objective concerning the winch-truck. There can be no clearer expression of Gibbons' connection with the winch-truck than his testimony elicited by his own attorney on direct examination as follows:

"Q. Now, did you become involved to any extent regarding the placement of this winch-truck on the highway or its movements?

A. No, sir. It was their winch-truck. I kinda figured they knew how to run it better than I. If he didn't know what to do with it, I sure didn't.

Q. But I mean you didn't actually become actively involved with the supervision or direction or anything with this truck?

A. No, sir."

Again when questioned by his own attorney Gibbons stated that when Willett asked him to use the cherry-picker he told him that he could do so and indicated that he offered to let some of McDermott's "hands" assist in getting the cherry-picker out. His attorney asked him:

"Q. Now did you ever actually tell Mr. Willett how to get this thing out or when to get it out?

A. No, sir. I did not tell him how to get that cherry-picker out. I didn't tell him to get it out, I just told him he could have it."

This was confirmed by Gibbons on two different occasions. When asked by counsel for CSI:

"Q. And is it your testimony this morning that you had not asked CSI or anybody else to pull this winch-truck (cherry-picker) out of the marsh?

A. No, sir. I did not ask them."

On further cross-examination, Gibbons again responded to questions by counsel for CSI as follows:

"Q. Let me ask you something. Didn't you tell Gene Willett to have his driver bring that winch-truck down and get the cherry-picker out of the marsh?

A. No, sir.

Q. As a matter of fact Mr. Gibbons, on the day two days after this accident happened, wasn't there some doubt in your mind as to whether you personally or yourself may have told that driver to get it out of there?

A. I didn't tell him to get it out of there. There was some question in my mind whether I suggested it or not.

Q. Would you like for me to read that testimony for you or have you had a chance to read for yourself?

A. I have read it.

Q. Well, I am going to read it to you again just so you won't forget it, * * * (reading of prior statement omitted). Now today you are very positive Mr. Gibbons that you did not ever ask them under any circumstances to pull that cherry-picker out of that marsh with their winch truck?

A. I did not ask them then to pull it out for my purposes, if they wanted to use it, fine."

Finally Gibbons testified that he left the entire operation in the hands of Willett and assumed that Willett had placed the flagman at his position. The jury expressly found that Willett was not negligent. If he was in charge of positioning the winch-truck, as testified by Gibbons, then the positioning of the winch-truck was certainly eliminated by the jury from any causal connection with the accident.

Since Gibbons emphatically denied that he had any subjective intent to use the winch-truck or to "employ it for the purpose of the user" and there was expressly no objective in his mind concerning the employment of the winch-truck, then legally and factually Gibbons was not "using" the winch-truck within the terms and provisions of the ACC policy. As a result of these facts and circumstances, Gibbons was clearly not exercising such a right of control over the winch-truck which would justify imposing legal responsibility upon him for its use.

Although this court can with strain visualize under an extremely liberal interpretation of "use" that Gibbons and Jones were using the winch-truck within the terms and provisions of the ACC policy, we feel that it would be contrary to all conceivable notions of equity, fair play and justice to so hold. The winch-truck was a part of the pattern of equipment used on the job, but this "use" will not bring McDermott under the coverage of the ACC policy. Certainly no one would hold that the insurer of the cherry-picker was liable merely because it was part of the equipment being used by McDermott on the job.

As stated earlier, we do not have the typical situation in which the policy factors favoring broad coverage are present. What we do have is a negligent party's insurance company seeking through a tortured interpretation of "use" to place the monetary responsibility for the accident upon a company completely exonerated of all liability by the jury. This we refuse to do.

McDermott's third party claim against CSI is therefore denied. In accordance with Local Rule 9(e), third party defendants should submit a judgment for formal execution.